UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

WILLIAM H.,[1]

                    Plaintiff,

v.                                                      ACTION NO. 2:23cv175

MARTIN O'MALLEY,[2]
Commissioner of Social Security,

                    Defendant.

UNITED STATES MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

        William H. filed this action for review of a decision by the Commissioner

("Commissioner") of the Social Security Administration denying his claim for Social Security

Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits under Titles II

and XVI of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

        An order of reference assigned this matter to the undersigned.  ECF No. 6.  The Court

recommends that plaintiff's motion for summary judgment (ECF No. 8) be **GRANTED,** and the

decision of the Commissioner be **VACATED AND REMANDED** for further proceedings

consistent with this recommendation.

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name
has been redacted for privacy reasons.  Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S.,
Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

[2] Martin O'Malley is now the Commissioner of Social Security and is automatically substituted as
a party pursuant to Fed. R. Civ. P. 25(d). *See also* 42 U.S.C § 405(g) (action survives regardless
of any change in the person occupying the office of Commissioner of Social Security).

# I.    **PROCEDURAL BACKGROUND**

William H. ("plaintiff") protectively filed applications for SSDI and SSI benefits in July 2020, alleging disability beginning on April 13, 2020, because of bipolar I with severe psychosis, manic depression, and severe social anxiety.  R. 13, 229–41, 253.[3]  The Disability Determination Service ("DDS") denied plaintiff's claim for SSDI on November 13, 2020, finding that "prior to the insured period ending[,] there is insufficient evidence to sufficient[ly] evaluate any alleged conditions." R. 88–96, 109–19.  Accordingly, the agency found plaintiff's impairments were not disabling on any date through his date last insured of March 31, 2020.[4]  *Id.*  The DDS approved plaintiff's claim for SSI, however, finding plaintiff was eligible as of July 9, 2020, the date of his application for SSI benefits.  R. 71–87, 121–36.

Plaintiff filed a request for reconsideration stating, "I am appealing the onset date of the Title II [SSDI] claim."  R. 120.  On reconsideration, the state agency found that plaintiff was not entitled to SSDI:  "[a]dditional information is needed that cannot be obtained prior to the [date last insured]" of March 31, 2020, and "prior to the insured period ending there is insufficient evidence to sufficient[ly] evaluate any alleged conditions."  R. 98–101.

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), stating that he was "filing this appeal as to onset date and T[itle] 2 benefits only."  R. 142–44.  The hearing notice issued December 6, 2021, clarified that the hearing concerned plaintiff's applications for SSDI *and SSI* and that the ALJ would consider whether plaintiff was disabled.  R. 165.  On January 31,

---

[3] Page citations are to the administrative record that the Commissioner previously filed with the Court.

[4] Plaintiff's date last insured was recalculated at the hearing level as March 31, **2024**.  R. 249–51. The Commissioner concedes that the March 31, 2020 date included in the initial findings was a miscalculation.  Def.'s Br. In Supp. of Comm'r's Decision Denying Disability Benefits, ECF No. 10, at 12; *see also* R. 13.

2022, Hannah Gallagher, plaintiff's counsel, wrote to ALJ Maryann Bright amending plaintiff's onset date to July 9, 2020. R. 220. Counsel further notified ALJ Bright that plaintiff's earnings records were recalculated when plaintiff reached the hearing level and the recalculation showed plaintiff's date last insured was March 31, 2024, rather than March 31, 2020. *Id.* Counsel requested that ALJ Bright issue a decision on the record, without holding a hearing, finding plaintiff disabled as of July 9, 2020, consistent with the finding on initial review, and awarding Title II benefits. *Id.*

ALJ Maryann Bright held an online video hearing attended by plaintiff and his counsel, Hannah Gallagher, on February 23, 2022, and issued a decision denying both SSDI and SSI benefits on August 23, 2022. R. 13–32. On March 1, 2023, the Appeals Council denied plaintiff's request for review of the ALJ's decision. R. 1–6. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

Having exhausted administrative remedies, plaintiff filed a complaint on April 27, 2023. ECF No. 1. In response to the Court's order, plaintiff filed a motion for summary judgment on July 24 and the Commissioner filed a brief in support of the decision denying benefits on August 22, 2023. ECF Nos. 7–10. As oral argument is unnecessary, this matter is ready for a decision.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    *Background Information and Hearing Testimony by Plaintiff*

During the hearing before the ALJ on February 23, 2022, plaintiff provided the following information. At that time, the 47-year-old plaintiff lived with his girlfriend. R. 43–44. Plaintiff completed the eighth grade and worked for 25 years as a plumber. R. 41–42, 45. Plaintiff had a driver's license, but very seldom drove. R. 44–45.

3

Plaintiff testified that he did not have any physical impairments that kept him from working, but could not work because of mental impairments, including auditory and visual hallucinations and depression. R. 43, 50. Plaintiff described working in 2020 for two weeks for a plumbing company. R. 45. The company let him go after he had a confrontation with two young workers over the volume they were playing their radio. R. 45–46. Plaintiff worked for the same company in 2018 as a foreperson in charge of three to four people, but was terminated because of his drinking, outbursts, and altercations. R. 45–47.

Shortly after he was terminated from the plumbing company in 2018, plaintiff violated his probation conditions because of a positive urine screen and served six months in jail. R. 47–48. In response to the ALJ's question about whether plaintiff had any outbursts while incarcerated, plaintiff testified that he was kept "pretty sedated" while incarcerated. R. 48.

Plaintiff testified that he continued to experience hallucinations, but his medications lessened their frequency and intensity. R. 50–51, 59–60. He described paranoid auditory hallucinations that occurred multiple times each day. R. 59–60. He gave two examples—voices telling him someone was out to get him and voices telling him that he should take a bottle of sleeping pills. R. 60. Plaintiff described experiencing visual hallucinations twice a month. R. 60–61.

Plaintiff also testified that his depression and anxiety were worsening, often resulting in panic attacks. R. 50–51, 59. At the time of his hearing, he was on antipsychotics and saw his doctor weekly, but wanted to change doctors because he did not feel that his doctor was working in his best interest. R. 50–52. He testified that he used marijuana two to three times per week to treat anxiety, but had not used any other drug for nine months and had not had alcohol for three months before the hearing. R. 51–53. Plaintiff testified that he had not had inpatient treatment in

4

the previous nine months.  R. 53.  Plaintiff attended therapy with a "good therapist."  R. 51.
Plaintiff described poor concentration, difficulty stabilizing his mood, and verbal outbursts.  R. 61.

When asked to describe his typical day, plaintiff explained that it depended on whether he
was in a manic high or manic low episode.  R. 54.  When in a manic low episode, plaintiff described
going to bed at 7:00 p.m. and sleeping most of the day.  *Id.*  He cleaned a bit and made himself
food, but needed reminders to shower.  *Id.*; *see* R. 58 (describing eating "a lot" during manic lows).
When in a manic high episode, he slept three to four hours at night, felt more active, and lost his
appetite.  R. 54, 58.  He stated that he had fewer highs than lows.  R. 54.  Plaintiff testified that he
was like a "guinea pig" based on trying different medications to manage these symptoms since he
was a young man.  R. 54–55.  Plaintiff described medication side effects such as becoming jittery,
loss of appetite, racing thoughts, and loss of sex drive.  R. 56–57.

Plaintiff helped his girlfriend with grocery shopping, avoiding "high-traffic areas."  R. 55.
Plaintiff visited his son and two grandchildren twice each week by either going to their home, or
having them come to his.  R. 44.  He did not watch his grandchildren alone, however, due to his
medications.  R. 45.  His brother and sister-in-law visited him monthly.  R. 55.  Plaintiff testified
that he has a good support system, has learned about triggers and coping mechanisms, and knows
that he needs to be medicated (due to decreased serotonin levels) and attend therapy.  R. 55–56.

### B.   *Hearing Testimony by Vocational Expert*

James Primm, a vocational expert ("VE"), also testified at the hearing.  R. 62–65.  The ALJ
presented VE Primm with a hypothetical premised on a person of plaintiff's age, education, and
work history, who is capable of work at all exertional levels, but has the following non-exertional
limitations: (a) only occasional decision-making and changes in the work setting; (b) no fast-paced
tasks, such as assembly-line jobs involving production quotas; (c) no interaction with the general

public; (d) only superficial interaction with co-workers and supervisors, that is occasional and casual contact not involving prolonged conversation or discussion of involved issues, but contact with supervisors still involves necessary instruction; and, (f) the ability to apply commonsense understanding, carry out uninvolved instructions, and perform simple, routine, and repetitive tasks on a regular and sustained basis to complete a normal workday and week. R. 63–64.

VE Primm stated that a claimant of plaintiff's age, education, work history, and RFC could not perform plaintiff's past relevant work as a plumber and plumber supervisor. R. 64. Such a person could perform work as a cleaner, laundry worker, and vehicle cleaner. *Id.* VE Primm testified that no work existed for a person who would have one or more unexcused absences per month, would be off task more than 10% of the time, or could not perform simple, routine, and repetitive tasks on a regular basis for eight hours a day, five days a week, or an equivalent work schedule. R. 64–65.

The ALJ then inquired if VE Primm's testimony was consistent with the Dictionary of Occupational Titles ("DOT").[5] *Id.* VE Primm responded that his testimony about interaction with the public, co-workers, and supervisors, as well as testimony about the inability to complete unskilled work full time, were based on his vocational experience, education, and training. R. 65.

## C.    *Relevant Medical Record*

### 1.    *Virginia Beach Psychiatric Center*

On July 5, 2020, August 20, 2020, and March 15, 2022, plaintiff was admitted for in-patient

---

[5] The *Dictionary of Occupational Titles*, and its companion, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*, are resources used by the SSA that review occupations present in the national economy and discuss physical and mental requirements pertaining to those occupations. *U.S. Dep't of Labor, Dictionary of Occupational Titles* (4th ed. 1991); *U.S. Dep't of Labor, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (1993).

treatment at Virginia Beach Psychiatric Center. He was admitted on July 5, 2020, for suicidal ideation, auditory hallucinations, and paranoid delusions. R. 460. Plaintiff reported that he had not taken his medications for six months and had been drinking heavily (1/2 liter of Vodka and 6 to 8 beers daily). *Id.* He also reported that he had gone to jail in February 2020 after testing positive for methamphetamines. *Id.* Plaintiff was initially placed on suicide precautions, started on medications, and was placed on an alcohol detox protocol. R. 360. Robert Light, M.D., performed plaintiff's mental status examination, noting an anxious affect, a mood reported as "not right," and thought content that included auditory command type hallucinations, suicidal ideation with no plan, and racing thoughts. *Id.* The remainder of the exam was normal. R. 460–61. Dr. Light diagnosed bipolar type, mixed, severe with psychotic features, severe alcohol use disorder, and moderate amphetamine use disorder. R. 461. Plaintiff was discharged on July 8, 2020, with a "good" prognosis and was prescribed Zyprexa, lithium, Cymbalta, Hydroxyzine, and Trazodone. R. 461–62.

Plaintiff was next admitted to Virginia Beach Psychiatric Center on August 20, 2020. R. 452. Plaintiff presented voluntarily stating that, two weeks previously, he had a verbal outburst at his job site. *Id.* His depression was much worse, and one week prior he had attempted to overdose on methamphetamine and heroin. *Id.* He reported anxiety with daily panic attacks and frequent, angry outbursts, auditory hallucinations, and racing thoughts. *Id.* Plaintiff's mental status examination upon admission was normal except for suicidal ideation, auditory hallucinations, and a labile mood. R. 452–53. His urine screen was positive for cannabis, amphetamine, and methamphetamine. R. 453. Dr. Light diagnosed bipolar, mixed, severe, with psychotic features, moderate alcohol use disorder, moderate methamphetamine use disorder, and mild opioid use disorder. *Id.* Plaintiff was placed on an alcohol detox protocol, prescribed medications, and

7

attended group therapy. *Id.* He was discharged on August 25, 2020, with a good prognosis and was prescribed Cymbalta, Allegra, Vistaril, Zyprexa, Trileptal, and Trazodone. R. 454.

Around 19 months later, plaintiff was admitted for inpatient treatment on March 15, 2022, after his psychiatrist recommended that he seek treatment. R. 510. Plaintiff reported severe depression for three months, daily suicidal ideation, auditory hallucinations, impulsivity, nightmares, flashbacks to childhood abuse, and severe anxiety with panic attacks, for which he had taken 6 Klonopin the previous day. *Id.* He reported smoking marijuana (over 8 joints a day) and cigarettes, but not using alcohol, methamphetamine, or opioids. R. 510–11. Plaintiff's mental status examination reflected a depressed and anxious mood, labile affect, no current suicidal ideation (but reported suicidal ideation the previous day), and restlessness. R. 511–12. His urine screen was positive for THC and benzodiazepines. R. 512. Leslie Kryzanowski, M.D., diagnosed plaintiff with bipolar disorder type 1, depression, generalized anxiety disorder, post-traumatic stress disorder ("PTSD"), severe cannabis use disorder, and polysubstance use disorder (that is, alcohol, opioids, and methamphetamines) in presumed remission. R. 513. Plaintiff's prognosis at discharge was guarded and he was prescribed Cymbalta, Gabapentin, Zyprexa, and Remeron. R. 514.

### 2.    *Chesapeake Integrated Behavioral Health*

Following his discharge from Virginia Beach Psychiatric Center in July 2020, plaintiff began treatment with Chesapeake Integrated Behavioral Health for medication management and therapy. R. 422. Plaintiff's initial intake and his therapy sessions were all conducted by telephone due to Covid-19. R. 400–22. Plaintiff reported auditory hallucinations, some delusions (believing his nephew would hurt his grandson), impulsivity, paranoia, isolation, saddened mood, and sleep and appetite disturbance. R. 422.

On July 27, 2020, Ewa Gaddis, M.D., performed a psychological evaluation of plaintiff. R. 413–17. Plaintiff had a normal mental status evaluation with a notation that his attention, concentration, short term memory, and fund of knowledge were slightly below the average range. R. 414–15. Dr. Gaddis diagnosed bipolar I disorder (current or most recent episode manic, with psychotic features), severe alcohol use disorder, severe cocaine use disorder in sustained remission, and mild cannabis use disorder in sustained remission. R. 415.

Plaintiff met with Stacey Fernandes, "LMHP-Eligible," for outpatient therapy by telephone twice in July 2020 and twice in August 2020. R. 403–06, 411–12, 420–21. On July 24, 2020, Ms. Fernandez noted a normal assessment—euthymic mood, normal speech, logical and linear thoughts, no suicidal ideation or homicidal ideation, and no audio or visual hallucinations. R. 420. Plaintiff reported a very low sense of self-worth and that he coped by isolating himself. R. 420–21. He reported struggling with focus and memory, trouble remembering medication, and that he had twice forgotten to take his medication that week. R. 421. Ms. Fernandes encouraged plaintiff to investigate grounding techniques and referred him to peer support. R. 420–21.

On July 31, 2020, Ms. Fernandes noted that plaintiff's mood was sad, but that he had an otherwise normal assessment. R. 411. Plaintiff reported that he was having a hard time with his bipolar symptoms, including auditory hallucinations, and that work had become too stressful. *Id.* He reported being "triggered" at work when two "kids" would not turn their music down, which caused him to "snap[]." *Id.*

On August 10, 2020, Ms. Fernandes again noted plaintiff's sad mood but otherwise normal assessment. R. 405. Plaintiff reported that he was feeling very depressed, and was isolating himself. *Id.* He suggested that his anger issues were affecting the people around him and that he had used marijuana "a little bit" to help when he was angry. R. 405–06. He reported one instance

9

of auditory hallucination. R. 406. He reported meditating and journaling, and was counseled to continue with this as well as return to NA meetings for support. R. 405–06.

On August 17, 2020, Ms. Fernandes noted plaintiff's sad mood and suicidal ideation. R. 403. She asked plaintiff to save the number for emergency services in his phone and directed plaintiff to go to the hospital if he felt like hurting himself. R. 404.

Over 18 months later, plaintiff returned to Chesapeake Integrated Behavioral Health for further therapy sessions with Ms. Fernandes, who was by that time a licensed professional counselor. R. 537. Plaintiff attended six sessions by video conference between April and July 2022. R. 527–38. Ms. Fernandes noted normal assessments for the first four of these sessions. R. 531, 533, 535, 537.

On April 27, 2022, plaintiff reported that he had been "okay," but had sleeping issues and struggled to get out of bed. R. 538. Plaintiff expressed difficulty maintaining relationships, and Ms. Fernandes encouraged plaintiff to think about how his father's abuse continued to affect him. *Id.* On May 11, 2022, plaintiff reported that he was "alright" and that his mood swings were more stabilized, although he continued to suffer with mood swings and had not eaten the previous day. R. 535–36. On May 26, 2022, plaintiff reported "making a little progress at a time," and that he was doing okay. R. 534. He remained sober, was implementing coping mechanisms like meditation into his daily routine, and rated his mental health distress as 4/10. *Id.* On June 10, 2022, plaintiff reported "doing well" and rated his mental health distress at 5/10. R. 532.

On June 24, 2022, Ms. Fernandes noted that plaintiff's mood was sad, but he had an otherwise normal assessment. R. 529. Plaintiff reported feeling low, snapping at everyone, and isolating himself. R. 530. Plaintiff reported continuing to stay sober, but was feeling worse and rated his mental health distress at a 6 or 7/10. *Id.* Ms. Fernandes continued to assess plaintiff with

a sad mood but otherwise normal assessment on July 6, 2022. R. 527. Plaintiff reported that he was not doing well, was having issues with his living situation, and he rated his mental distress at a 9/10. R. 528. Plaintiff reported a three-day manic episode during which he did not take his medications. *Id.*

### 3.   *Alpha Psychological Services, LLC*

Between April and December 2021, plaintiff was evaluated at Alpha Psychological Services six times for medication management. R. 470–503. Each time, plaintiff's mental status exam was normal with notations that he was stable, alert, fully oriented with a full range of affect, cooperative attitude, well groomed, normal speech, good eye contact, normal mood, goal directed and logical thought process, normal thought content, no psychotic features, normal insight and impulse control, intact judgment, normal attention, appropriate concentration, average fund of knowledge, normal memory, and good compliance with treatment with no significant side effects. R. 473, 481, 488, 492, 497, 502.

In April 2021, plaintiff reported to Ama Boateng, FNP-C, that he was experiencing fewer audio hallucinations, but feeling paranoid and struggling with focus and concentration. R. 500. She prescribed Cymbalta and Buspirone. R. 503. In May 2021, plaintiff reported increased nervousness, heart rate, anhedonia, and a lack of concentration, and his medications remained the same. R. 495, 498. In July 2021, plaintiff reported improvement in his depression, irritability, anhedonia, and concentration. R. 490. NP Boateng prescribed Trileptal, Cymbalta, and Zyprexa, which plaintiff continued to take for the remainder of his treatment with Alpha Psychological Services. R. 476, 483, 489, 494. His prescription for Rexulti was not filled as it was not covered by his insurance. R. 485, 494. In August 2021, plaintiff reported an increase in his depressive and anxious symptoms—worry, feeling overwhelmed, overthinking, irritability, anhedonia, and lack

11

of concentration.  R. 485.  He also experienced an increase in impulsivity and mood swings, but had not experienced hallucinations or delusions.  *Id.*

In October 2021, plaintiff's care was transferred to Tiffany Johnson, PA-C.  R. 478.  While he reported that his medications were working for the most part, plaintiff was still experiencing anxiety, depression, and manic episodes.  *Id.*  He struggled to stay focused, experienced some auditory and visual hallucinations, and had increased symptoms of worry, feeling overwhelmed, overthinking, irritability, anhedonia, impulsivity, and mood swings.  *Id.*  Plaintiff was prescribed Propranolol in addition to Trileptal, Cymbalta, and Zyprexa.  R. 483.  In December 2021, plaintiff reported that he had missed some of his medications because of being physically ill after catching a cold from his grandson.  R. 470.

### 4.    *Opinions of State Agency Experts*

In connection with plaintiff's mental RFC, Leslie Montgomery, Ph.D., opined on initial review that plaintiff was moderately limited in his ability to:  (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) sustain an ordinary routine without special supervision; (4) work in coordination with or in proximity to others without being distracted by them; (5) interact appropriately with the general public; (6) accept instructions and respond appropriately to criticism from supervisors; (7) respond appropriately to changes in the work setting; and (8) travel in unfamiliar places or use public transportation.  R. 80–83.  Dr. Montgomery found plaintiff was markedly limited in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  R. 81.

Dr. Montgomery found that plaintiff could make simple decisions and understand, retain, and follow simple job instructions (perform one and two step tasks). R. 80–83. Dr. Montgomery explained that, because of plaintiff's bipolar disorder with recurrent psychosis, he would have difficulty with detailed instructions, interacting with others at more than a superficial level, responding to changes in the work setting, traveling to unfamiliar places, and completing a normal workday without interruptions due to his history of decompensation. *Id.* Dr. Montgomery concluded that plaintiff was limited to less than simple, routine work and was disabled. R. 85–86. Dr. Montgomery then addressed plaintiff's history of both alcohol and substance abuse, but found that this was not material to the disability determination. *Id.*

As for plaintiff's claim for SSDI, Dr. Montgomery found there was insufficient evidence predating the date last insured of March 31, 2020, to perform the psychiatric review technique or evaluate plaintiff's symptoms and there were no medical opinions from any medical source. R. 94. Dr. Montgomery concluded that plaintiff's condition was not disabling on any date through the date last insured of March 31, 2020, because "[t]he evidence in [the] file is not sufficient to fully evaluate [the] claim and the evidence needed cannot be obtained." R. 95. On reconsideration of the SSDI claim, Joseph Leizer, Ph.D., agreed with Dr. Montgomery's opinions. R. 99–101.

**5.    *Consultative Examination – Mark A.D. Long, LCP***

On July 6, 2022, Mark Long, Ed.D., LCP, performed a consultative examination of plaintiff at the request of the SSA. R. 541–45. Dr. Long reviewed all records provided, which included records from Alpha Psychiatric Services, Virginia Beach Psychiatric, and Chesapeake Integrated Behavioral Health.[6] R. 541. At the time of the evaluation, plaintiff was seeing a doctor from

---

[6] Long states that he was originally provided with some records from Alpha Psychiatric Services

"Coastal" one time each month for medication management, and was receiving individual counseling from Chesapeake Integrated Behavioral Health. *Id.*

Dr. Long summarized plaintiff's report of a long history of psychiatric problems with bipolar 1, psychosis, PTSD, and attention-deficit/hyperactivity disorder ("ADHD"); his being in and out of psychiatric hospitals, overdosing several times, and going through detox; abuse by his parents as a child; incarceration for drugs; prior use of cocaine, heroin, methamphetamines, pain pills, marijuana, and alcohol; and his substance abuse treatment. R. 541–42.

Dr. Long performed a mental status examination, noting that plaintiff was casually attired, cooperative with good eye contact, alert and fully oriented, and his speech was normal, however, he was restless, frustrated, annoyed, irritable, anxious, had an intense affect, and tended to digress on tangents. R. 542–43. Dr. Long noted plaintiff's report that "[c]annabis is his current preferred drug of use," that he smokes daily to help with anxiety and appetite, but that he had not used marijuana before the examination. R. 543.

Dr. Long diagnosed plaintiff with bipolar disorder 1, severe with psychotic features, anxiety disorder, cannabis use disorder, tobacco use disorder, alcohol use disorder, and a history of cocaine use disorder, opioid use disorder, methamphetamine use disorder, and benzodiazepine use disorder. R. 544. Dr. Long explained that plaintiff's prognosis was poor to guarded even with outpatient psychiatric treatment and psychotherapy. *Id.* With respect to plaintiff's functional limitations, Dr. Long stated:

> At this time, [plaintiff] is not interested in seeking employment. He does have a history of being able to maintain regular work hours and attendance. He is able to

---

(pages 3–9 of 36), and he requested additional records from DDS. R. 9, 541. He was then provided with discharge summaries from four inpatient treatments at Virginia Beach Psychiatric and progress notes from four therapy sessions in 2020 with Chesapeake Integrated Behavioral Health. *Id.* Long comments that "no other recent behavioral health records were provided for review." *Id.*

complete simple and moderate tasks and sometimes complex tasks when he is psychiatrically stable. However, his psychiatric stability seems to vary over the course of the day and over time. He is likely to be hired for a job if he applies for one and is highly unlikely to be able to maintain it. [Plaintiff] relates and interacts with others in an intense, demanding and often inappropriate fashion. Others will immediately recognize that he has psychiatric problems. He experiences marked problems being able to hear and cope appropriately with feedback from others, including supervisors, coworkers, customers and others; and tends to react intensely and angrily.

*Id.*

Dr. Long also completed a medical source statement finding plaintiff had a mild impairment in understanding, remembering, and carrying out simple instructions; a mild to moderate impairment in his ability to make judgments on simple work-related decisions; a moderate impairment in understanding and remembering complex instructions; a moderate to marked impairment with carrying out complex instructions; and a marked impairment in his ability to make judgments on complex work-related decisions. R. 546. Dr. Long explained that plaintiff was anxious, angry, depressed, often reactive, and a poor listener with poor interpersonal skills. *Id.* As for his ability to interact with others, Dr. Long found plaintiff had a moderate to marked impairment in his ability to interact appropriately with the public; a marked impairment in his ability to interact appropriately with supervisors or respond appropriately to usual work situations and changes in a routine work setting; and a marked to extreme impairment in his ability to interact appropriately with co-workers. R. 547. Dr. Long explained that plaintiff's bipolar and anxiety disorders "result in very poor social and interpersonal skills and extreme difficulties getting along." *Id.* With respect to his ability to concentrate, persist, or maintain pace, Dr. Long noted that plaintiff's attention span is short and he has poor concentration due to his bipolar disorder and his anxiety. *Id.*

15

When asked whether his answers would change if plaintiff totally abstained from using alcohol or abusing substances, Dr. Long responded that plaintiff's ongoing and history of polysubstance abuse and dependence have been problematic for him. *Id.* Dr. Long concluded, "[b]ased upon DDS evaluation, [plaintiff would] likely have significant and marked limitations due to his Bipolar Disorder and Anxiety Disorder." *Id.*

### III.    THE ALJ's DECISION

To evaluate plaintiff's claim of disability,[7] the ALJ followed the five-step analysis set forth in the SSA's regulations. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The ALJ considered whether plaintiff: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents him from performing any past relevant work considering his RFC; and (5) had an impairment that prevents him from engaging in any substantial gainful employment. R. 16–28.

In 1996, the Contract with America Advancement Act amended the Social Security Act to preclude a finding of disability "if alcoholism or drug addiction is a material contributing factor to the disability finding." *Delk v. Colvin*, 675 F. App'x 281, 283 (4th Cir. 2017) (citation omitted); 42 U.S.C. § 423(d)(2)(C) ("An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing

---

[7] To qualify for SSDI, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a); 416.905(a). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. *Id.*

factor material to the Commissioner's determination that the individual is disabled."). The regulations that implement this provision "specify that alcoholism or drug addiction is a [material] contributing factor . . . if an individual would not be disabled if he stopped using alcohol or drugs." *Mitchell v. Comm'r of the Soc. Sec. Admin.*, 182 F.3d 272, 274 n.2 (4th Cir. 1999) (citing 20 C.F.R. §§ 404.1533(b), 416.935(b)). Accordingly, when an ALJ finds a plaintiff disabled and finds evidence of substance abuse, she must determine whether the disability would exist in the absence of the substance abuse. *Delk*, 675 F. App'x at 283 (citation omitted). If a plaintiff would no longer be disabled in the absence of alcohol or drug use, then substance use constitutes a material contributing factor that precludes a finding of disability. *Id.*

Social Security Ruling ("SSR") 13-2p provides guidance for determining materiality. 2013 WL 621536 (Feb. 20, 2013). First, the plaintiff bears the burden of proving his disability in the absence of alcohol or drug use. *Id.* at *4 ("When we apply the steps of the sequential evaluation a second time to determine whether the claimant would be disabled if he or she were not using drugs or alcohol, it is our longstanding policy that the claimant continues to have the burden of proving disability throughout the . . . materiality analysis.").[8] To support a finding that plaintiff's substance use is material, there must be "evidence in the case record that establishes that a claimant with a co-occurring mental disorder(s) would not be disabled in the absence of [substance use]." *Id.* at *9.[9] SSR 13-2p provides that, "[w]e will find that [substance use] is not material . . . if the record

---

[8] The ruling clarifies that, "[t]here does not have to be evidence from a period of abstinence for the claimant to meet his or her burden of proving disability." 2013 WL 621536, at *4.

[9] SSR 13-2p explains that, "[w]e do not know of any research data that we can use to predict reliably that any given claimant's co-occurring mental disorder would improve, or the extent to which it would improve, if the claimant were to stop using drugs or alcohol. To support a finding that [drug addiction and alcoholism] is material, we must have evidence in the case record that establishes that a claimant with a co-occurring mental disorder(s) would not be disabled in the absence of [drug addiction and alcoholism]. Unlike cases involving physical impairments, we do

is fully developed and the evidence does not establish that the claimant's co-occurring mental disorder(s) would improve to the point of nondisability in the absence of [substance use]." *Id.*

The ALJ found that plaintiff met the insured requirements[10] of the Social Security Act through March 31, 2024, and had not engaged in substantial gainful activity from April 13, 2020, his alleged onset date of disability. R. 16. Plaintiff's earnings in 2020 were under the amount indicative of substantial gainful activity. *Id.*

At steps two and three, the ALJ found that plaintiff had the following severe impairments: (a) bipolar disorder; (b) generalized anxiety disorder; (c) polysubstance abuse disorder; and (d) personality disorder. *Id.* The ALJ classified plaintiff's other impairments, including gastroesophageal reflux disease, allergies, migraine headaches, back pain, and attention deficit hyperactivity disorder, as non-severe. *Id.* The ALJ further determined that plaintiff's severe impairments, either singly or in combination (along with his other conditions), failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 17–19. In making this finding, the ALJ explained that plaintiff had a mild limitation in his ability to understand, remember, and apply information; a moderate limitation in interacting with others, and concentrating, persisting, and maintaining pace; and a marked limitation in adapting or managing himself. R. 18.

The ALJ next found plaintiff possessed an RFC for a full range of exertional levels but with the following non-exertional limitations: (a) only occasional decision-making and changes

---

not permit adjudicators to rely exclusively on medical expertise and the nature of a claimant's mental disorder." 2013 WL 621536, at *9.

[10] In order to qualify for SSDI, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

in the work setting; (b) no fast-paced tasks, such as assembly-line jobs involving production quotas; (c) no interaction with the general public; (d) only superficial interaction with co-workers and supervisors, meaning occasional and casual contact not involving prolonged conversation or discussion of involved issues, but contact with supervisors still involves necessary instruction; and, (e) cannot perform simple, routine, or repetitive tasks on a regular and continuing basis for eight hours a day, five days a week for a 40-hour workweek or equivalent schedule.  R. 19–27.

At step four, the ALJ decided, consistent with the VE's testimony, that plaintiff could not return to his past relevant work as a plumber or plumber supervisor.  R. 27.

Finally, the ALJ proceeded to step five, and found, having considered the VE's testimony and plaintiff's age, education, work experience, and RFC based on all impairments, including the substance use disorder, there were no jobs available in the national economy that he could perform. R. 27–28.

The ALJ then determined that, if plaintiff stopped substance use, he would have a severe impairment or combination of impairments that would not meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  R. 28–30.  In making this finding, the ALJ explained that, if plaintiff stopped substance use, plaintiff would still have a mild limitation in his ability to understand, remember, and apply information; and a moderate limitation in interacting with others, and concentrating, persisting, and maintaining pace; but would only have a moderate limitation in adapting or managing himself.  R. 29.

The ALJ next found that, if plaintiff stopped substance use, he would possess an RFC for a full range of exertional levels but with the following non-exertional limitations:  (a) only occasional decision-making and changes in the work setting; (b) no fast-paced tasks, such as assembly-line jobs involving production quotas; (c) no interaction with the general public; (d) only

19

superficial interaction with co-workers and supervisors, meaning occasional and casual contact not involving prolonged conversation or discussion of involved issues, but contact with supervisors still involves necessary instruction; and (e) the ability to apply commonsense understanding and carry out uninvolved instructions to perform simple, routine, and repetitive tasks on a regular and sustained basis to complete a normal workday and week. R. 30–31.

Next, the ALJ determined that, if plaintiff stopped substance use, considering the VE's testimony and plaintiff's age, education, work experience, and RFC, that plaintiff could not perform past relevant work, but could perform other jobs in the national economy, such as cleaner, laundry worker, and vehicle cleaner. R. 31–32.

The ALJ determined that substance use was a factor material to the determination of disability because plaintiff would not be disabled if he stopped substance use. R. 32 (citing 20 C.F.R. §§ 404.1520(g), 404.1535, 416.920(g), and 416.935). Accordingly, the ALJ concluded plaintiff was not disabled from his alleged onset date through the date of the decision and was ineligible for SSDI or SSI. R. 32.

## IV.   STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see*

20

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Johnson*, 434 F.3d at 653. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id.* (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached through an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Thus, reversing the denial of benefits is appropriate only if either (a) the record lacks substantial evidence supporting the ALJ's determination, or (b) the ALJ made an error of law. *Id.*

## V.   ANALYSIS

Plaintiff asserts that the ALJ: (1) lacked jurisdiction to review the SSI claim; and (2) erroneously rejected the consultative examiner's opinions stating the examination was not conducted by an acceptable medical source and without attempting to remedy the perceived error in violation of the recent Fourth Circuit opinion in *Oakes v. Kijakazi*. Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br."), ECF No. 9, at 6, 8–9.

The Commissioner contends the ALJ correctly considered plaintiff's concurrent claims for SSI and SSDI. Def.'s Br. In Supp. of Comm'r's Decision Denying Benefits ("Def.'s Br."), ECF No. 10, at 12. Although conceding that the ALJ incorrectly found the consultative examiner was not an acceptable medical source, the Commissioner asserts this is harmless error because the ALJ thoroughly discussed the examiner's opinions and found them to be partially persuasive. *Id.* at

21

14–15.  The Commissioner then distinguishes the *Oakes* case, arguing the ALJ did not err by failing to order an additional consultative examination.  *Id.* at 15.  Lastly, arguing that plaintiff waived any challenge to the substantive merits of the ALJ's decision, the Commissioner argues that substantial evidence supports the ALJ's decision.  *Id.* at 2–3, 16.

## A.    *The ALJ had jurisdiction over plaintiff's SSI claim.*

Plaintiff argues the ALJ did not have jurisdiction to address his previously approved SSI claim as part of his appeal of the denial of SSDI benefits.  Plaintiff notes that his request for reconsideration, filed on January 13, 2021, appealed only the SSDI claim and not his claim for SSI benefits.  Pl.'s Br. 6 (citing R. 120).  The disability determination at the reconsideration level and request for a hearing before an ALJ similarly only addressed the SSDI claim.  *Id.*; *see* R. 97–102, 142–44.  Plaintiff contends that, because the SSI claim was not part of the initial appeal, the reconsideration and determination, or the request for hearing before an ALJ, the ALJ did not have the authority to review the SSI claim.  Pl.'s Br. 6.

Plaintiff concedes that the Social Security Program Operations Manual System ("POMS")[11] DI 12010.001(B)(5) provides that a request for hearing "shall result in the ALJ having jurisdiction over both the SSDI and SSI claim even if an award of SSI benefits was made."  *Id.* at 7; *see* https://secure.ssa.gov/apps10/poms.nsf/lnx/0412010001 (last visited February 15, 2024). Plaintiff argues that this guidance applies in two situations:  (1) where both SSI and SSDI claims were reviewed and adjudicated on reconsideration, and (2) where review occurred in a state (unlike Virginia) that does not have a reconsideration level of review, but where appeals are taken from the initial determination to the ALJ.  *Id.*  Plaintiff contends that, in Virginia, which has a

---

[11] POMS are internal agency directives that are binding on the ALJs.  *Teresa v. Saul*, No. 3:19cv462, 2020 WL 5228161, at *4 n.5 (E.D. Va. Aug. 17, 2020), *report and recommendation adopted*, 2020 WL 5204084 (E.D. Va. Sept. 1, 2020).

reconsideration level review, the ALJ only has jurisdiction over SSDI and SSI where both claims were reviewed on reconsideration. *Id.* Plaintiff cites no case in support of this argument.

Pursuant to Social Security regulations,

The issues before the administrative law judge include all the issues brought out in the initial, reconsidered or revised determination that were not decided entirely in your favor. *However, if evidence presented before or during the hearing causes the administrative law judge to question a fully favorable determination, he or she will notify you and will consider it an issue at the hearing.*

20 C.F.R. § 404.946(a) (emphasis added); *see also* 20 C.F.R. § 416.1446(a). The notice of hearing before the ALJ issued December 6, 2021, notified plaintiff that the hearing would concern plaintiff's claims for both SSDI and SSI. R. 165.

Further, POMS DI 12010.001B5 provides:

**5.      Concurrent claims**

If an application involves claiming Title II and Title XVI benefits . . . and the claimant appeals any medical issue for any of the benefits, the entire claim is under review, including any favorable determination regarding disability status. Therefore, transfer the case as a concurrent claim for a hearing before an ALJ.

The [field office] may still effectuate the favorable determination, but the claimant should be aware that our determination regarding the medical issue is not final.

If the other claim was a technical denial that is not under appeal, do not forward the technically denied claim for a hearing before an ALJ as the issues under appeal are not the same.

POMS DI 12010.001(B)(5) (Dec. 14, 2021); *see* R. 26–27.

Plaintiff's Title II and Title XVI claims are concurrent claims. Plaintiff's applications for SSDI and SSI were dated July 10 and July 13, 2020, and plaintiff indicated in his SSDI application that he was also applying for SSI. R. 229, 231. The applications listed the same onset date and relied on the same disability report. R. 229, 231, 253. The state agency made an initial determination in both claims on November 13, 2020. R. 67, 69, 87, 96. Plaintiff and his attorney,

Hannah Gallagher, completed an appointment of a representative form before the ALJ hearing, which indicated that the representation was with respect to a "Claim/Appeal for Title II Disability Benefits," "Claim/Appeal for Title XVI Disability Benefits," and "Concurrent Title II and Title XVI Disability Benefits." R. 194. The request for review of the hearing decision form also indicates the Title II and Title XVI claims are concurrent. R. 224.

The ALJ has the ability pursuant to 20 C.F.R. § 404.946 and § 416.1446 to consider fully favorable determinations along with those that were not decided entirely in plaintiff's favor. As plaintiff filed concurrent claims for SSI and SSDI and appealed a "medical issue" to the ALJ with respect to the SSDI claim (the onset date of his disability), the POMS directs that "the entire claim is under review, including any favorable determination regarding disability status." POMS DI 12010.001B5; *see* R. 120. The ALJ also notified plaintiff in writing that both claims would be addressed in advance of the hearing. R. 163–67. Accordingly, the ALJ had jurisdiction to review plaintiff's SSI claim.

**B.**     *The ALJ erred in evaluating the opinion of the consultative examiner.*

After ordering a consultative examination, the ALJ discounted the consultative examiner's opinion, in part, based on an incorrect determination that the examiner was not an acceptable medical source. The determination of the RFC "is an agency-conducted administrative assessment that considers all relevant" medical and other evidence. *Caulkins v. Kijakazi*, No. 20-1060, 2022 WL 1768856, at *5 (4th Cir. June 1, 2022) (citing 20 C.F.R. § 416.945(a)(3)); *see also* 20 C.F.R. §§ 404.1545(a)(3), (c), 416.945(a)(3), (c)).[12]   The agency's responsibility is to "develop [a

---

[12] "Other evidence" includes statements or reports from the claimant, the claimant's treating or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. §§ 404.1529(a), (c), 416.929(a), (c).

claimant's] complete medical history," upon which a determination about disability may be made. 20 C.F.R. §§ 404.1512(a)(2), (b)(1), 416.912(a)(2), (b)(1).   In some cases, the record is "insufficient" – that is, lacking the information needed to assess disability, or "inconsistent" – that is, "conflict[ing]," "ambiguous," or not "based on medically acceptable clinical or laboratory diagnostic techniques." 20 C.F.R. §§ 404.1520b(b), 416.920b(b).  Depending on the issues in any case, the agency "may" seek additional evidence, for example, by recontacting medical sources, seeking more information, or by ordering a consultative examination ("CE").   20 C.F.R. §§ 404.1520b(b), 416.920b(b); *see also* 20 C.F.R. §§ 404.1519a(b), 416.919a(b) (describing when a CE may be sought).

Following plaintiff's hearing, the ALJ ordered a psychological evaluation of plaintiff, and DDS referred plaintiff to Mark Long, Ed.D., LCP, with Community Psychological Resources for a mental status evaluation. R. 540–41. Mark Long is a licensed clinical psychologist, R. 541, and licensed clinical psychologists are acceptable medical sources.   20 C.F.R. §§ 404.1502(a)(2), 416.902(a)(2).  After outlining Dr. Long's findings, ALJ Bright stated, "[t]o the extent that this is considered a medical opinion (Mr. Long is not an acceptable medial source), the undersigned finds this statement and subsequent opinion partially persuasive." R. 26.  The Commissioner concedes that the ALJ erred in finding that Dr. Long was not an acceptable medical source.  Def.'s Br. 14.

Plaintiff asserts that the ALJ "erroneously rejected" Dr. Long's opinions by finding that Dr. Long was not an acceptable medical source, and the ALJ's failure to attempt to remedy the problem, such as by ordering another consultative examination, is similar to an ALJ's reversible error in *Oakes v. Kijakazi*, 70 F.4th 207, 214 (4th Cir. 2023). Pl.'s Br. 8–10. The Commissioner asserts that, despite finding that Dr. Long was not an acceptable medical source, the ALJ "thoroughly discussed" the opinions, found them partially persuasive (rather than rejecting them

25

as argued by plaintiff), and incorporated many of Dr. Long's findings into plaintiff's RFC. Def.'s

Br. 15. To remand under these circumstances, the Commissioner argues, would be a "meaningless

and futile exercise." *Id.*

ALJ Bright's treatment of Dr. Long's opinions is problematic. In finding Dr. Long's

opinions partially persuasive, ALJ Bright states:

> To the extent that this is considered a medical opinion (Mr. Long is not an
> acceptable medical source), the undersigned finds this statement and subsequent
> opinion partially persuasive. His statement seems to embody the claimant's issues
> that would fall under the areas of interacting with others and adapting or managing
> himself. The undersigned mostly incorporated these findings, save for a marked
> limitation in dealing with others. As stated above, there is mitigating evidence that
> causes only a moderate limitation in this area. Regarding the quantification of the
> claimant's mental limitations, the undersigned finds only that those
> activities/abilities falling under the area of adapting or managing oneself to be
> marked. The claimant has no extreme limitations. He has required multiple
> hospitalizations. However, he has also seen improvement with treatment.

R. 26.

An ALJ must consider and explain the persuasiveness of each medical opinion in the

record.[13]  20 C.F.R. §§ 404.1520c(b), 416.920c(b). In assessing persuasiveness, an ALJ's chief

task is to decide and explain whether an opinion or finding is supported by and consistent with the

record.[14]  *Id.* §§ 404.1520c(b)(2), (c)(1)–(2), 416.920c(b)(2), (c)(1)–(2). ALJ Bright fails to

adequately address either the consistency or supportability of Dr. Long's opinions. One possible

---

[13] A "medical opinion" is a statement from a medical source about a claimant's limitations and
ability to perform physical, mental, and other work demands, and to adapt to a workplace
environment, despite his impairments. 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).

[14] Supportability is an internal review that requires an ALJ to consider how "objective medical
evidence and supporting explanations presented by a medical source . . . support his or her medical
opinion(s)." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). By comparison, consistency is an
external review that requires an ALJ to determine how "consistent a medical opinion(s) . . . is with
the evidence from other medical sources and nonmedical sources." *Id.* §§ 404.1520c(c)(2),
416.920c(c)(2).

reason for that oversight could be that she found that Dr. Long is not an acceptable medical source. Due to the ALJ's ambiguous phrasing—"[t]o the extent that this is considered a medical opinion (Mr. Long is not an acceptable medical source) . . ."—it is difficult to know if, and to what extent, this misclassification affected the ALJ's evaluation of Dr. Long's opinions.

The ALJ's discounting of Dr. Long's opinions is crucial to the decision as Dr. Long provides the only medical opinions in the record from an expert who examined plaintiff. This leaves only the opinions of the state agency consultant, Dr. Montgomery, who reviewed plaintiff's medical record and concluded that plaintiff had disabling mental health impairments, and that his alcohol and substance abuse was not material to that determination. R. 85–86.

In *Oakes v. Kijakazi*, 70 F.4th 207, 214 (4th Cir. 2023), the ALJ similarly discounted the opinion of the consultative examiner, the only examining medical source opinion. The medical record in *Oakes* consisted of two emergency room visits in 2018, during which Oakes had a normal gait. *Id.* at 211, 214. Following an examination in 2019, the consultative examiner determined that Oakes should use an ambulatory device. R. 213. The ALJ concluded that this determination was based on Oakes' subjective complaints and not on any objective medical evidence, and refused to adopt the ambulatory device recommendation into Oakes' RFC. *Id.* The Fourth Circuit found that the ALJ improperly discounted the opinion of the consultative examiner. *Id.* The court noted that, although the opinion offered little explanation for the recommendation of an ambulatory device, the record contained imaging studies that could constitute objective evidence to support the recommendation and the ALJ should have sought clarification from the consultative examiner under 20 C.F.R. § 404.1520b(b). *Id.* at 213–14. The Fourth Circuit reversed and remanded to the ALJ, explaining

27

> [w]e . . . remain troubled by the tension here between an applicant's sparse medical record and an ALJ's dismissive treatment of a consultative examination ordered to remedy precisely that issue—particularly where the ALJ did not engage in regulatorily permitted remedial measures. Given these concerns, at this stage, it can neither be said that the ALJ applied sound legal standards, nor that substantial evidence supports a denial of benefits.

*Id.* at 217.

Similar to *Oakes*, the ALJ presumably referred plaintiff for a consultative examination because of the lack of a medical opinion from any examining source and in an effort to develop the record. If the ALJ hesitated to rely on the consultative examiner's opinions believing that the examiner was not an acceptable medical source, the ALJ could have sought to clarify or remedy the perceived inadequacy with the consultative examiner. The ALJ erred in deciding to discount the consultative examiner's opinions based, in part, on the erroneous conclusion that the consultative examiner was not an acceptable medical source without taking further steps to develop the record, and without evaluating the supportability and consistency of the opinions.

## VI.     RECOMMENDATION

For these reasons, the Court recommends that plaintiff's motion for summary judgment (ECF No. 8) be **GRANTED**, and the decision of the Commissioner be **VACATED AND REMANDED** for further proceedings.

## VII.     REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of

the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.      A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
February 15 , 2024

29